SAMUEL, Judge.
This is an appeal from a judgment dismissing plaintiff’s suit for total and permanent disability benefits, penalties and attorney’s fees under the provisions of the Louisiana Workmen’s Compensation Act.
The industrial accident occurred on July 10, 1972 when plaintiff, a fishing tool operator,[1] stepped on a nail which lodged in his left heel causing osteomyelitis, necessitating an operation, and resulting in an 8% permanent partial disability of the left leg. Plaintiff was paid compensation in the sum of $3,969 and medical payments in the amount of $4,727 through January 29, 1974, at which time he returned to his regular occupation.
The trial court judgment is based on a finding that plaintiff was not permanently disabled and was not entitled to permanent partial disability benefits, but that his disability fell under the scheduled loss provisions of LSA-R.S. 23:1221(4)(h) and (o)[2] and that the amount he would be entitled to receive under those scheduled loss provisions was less than the amount already received from the defendant.
In this court plaintiff contends: (1) he is permanently and totally disabled; and, alternatively, (2) he is entitled to permanent partial disability benefits.
Pertinent medical evidence in the record consists of the testimony of Drs. Dexter Gary and Irving Redler, orthopedic specialists, and the reports of Drs. Ernest Ellender and Pierre A. Espenan.
Dr. Ellender treated plaintiff for an infected nail puncture wound of the heel from July 12, 1972 until June 25, 1973. During the course of treatment x-rays showed plaintiff had developed osteomyeli-tis of the os calcis. He referred plaintiff to Dr. Gary.
Dr. Gary hospitalized plaintiff and operated on him on July 30, 1973 to try to prevent a reactivation of the osteomyelitis. On December 19, 1973 plaintiff was advised to return to work on a trial basis. Dr. Gary discharged him to return to work without restrictions, and gave him a permanent partial disability rating of 10% of the lower extremity. Plaintiff returned to work on January 2, 1974, but worked only a few days because of the pain he said he was suffering.
Plaintiff went back to Dr. Gary in February, but the doctor could find no clinical evidence of a recurrence of the infection. When last seen on May 26, 1975, three days before the trial, plaintiff had returned to his occupation of fishing tool operator but told the doctor he suffered pain after four or five hours of standing. Plaintiff again was discharged to return to work with an 8% physical impairment. The fact that he *781 was able to, and did return to work, reduced the percentage of disability the doctor felt plaintiff had sustained. While Dr. Gary did find plaintiff’s complaints of pain after working long periods wholly in line with the injury, he concluded this would not prevent plaintiff from fulfilling his full duties as a fishing tool operator.
Dr. Redler saw plaintiff twice, on May 30, 1974 and May 1, 1975. He concluded the nail had produced the osteomyelitis, and the cause of plaintiffs pain at his initial examination might be due to new growth of bone. No further surgery was indicated. Dr. Re-dler concluded the osteomyelitis would remain with plaintiff throughout his life, although it might not manifest itself again. However, it had the potential to flare up at any time. He was of the opinion that plaintiff did have an impairment of the function of the leg as a result of the accident, but that a return to work would not be deleterious to his health. f
Dr. Espenan saw plaintiff on July 13, 1973. Although primarily concerned with the problem of preventing a future flareup of the osteomyelitis, he did not feel plaintiff would be disabled from his former occupation as long as a future flareup responded to surgical management.
Plaintiff testified at the time of the accident he made approximately $1,440 per month. After he was hurt he obtained work as a truck driver and a security guard but had to quit both jobs because of pain in his leg with long periods of standing. He also worked as a desk clerk at a hotel. He is now employed at a salary of $800 per month for another company as a fishing tool operator doing the same work he had done when the injury was sustained. He conceded he has been able to perform all the tasks required of him on the present job. However, he has pain in the left heel after 3, 4 or 5 hours of standing. His foot swells and he has a sharp pain also associated with numbness. He would like to get in another line of work because this job requires standing for long periods, but he only has a fifth grade education and in spite of the pain he must continue working for economic reasons.
Maurice Golden, a retired fishing tool operator, testified as an expert as to those duties. He stated the average job is fifteen hours per day, much of which time is spent standing. While he agreed the operator’s primary function is as a supervisor he indicated the supervisor spent a great deal of time on his feet. His testimony indicates the supervisory nature of the job is not a “desk job”.
John Dishman, president of the corporation currently employing plaintiff, deposed that he has never been informed plaintiff could not perform all of the duties of a fishing tool operator. He stated plaintiff’s duties involve supervising the makeup and operation of the tools which he brings to the job, and that the most time he would be on his feet would be six hours and that there would be several rest breaks during that period of time.
Macklin Wall was deposed as an expert on the duties of a fishing tool operator. He described the duties as more mental than physical, stating that after the tools were chosen, calibrated and “dressed” by the operator, the drilling crew performed the manual labor under the supervision of the operator. He also said it normally takes Vá to 2 hours to set up the tools, but after that it would never be necessary for the operator to stand for longer than 1 hour at a time.
Clearly, all of the evidence is to the effect that plaintiff can perform, and in fact is performing, all of his duties as a fishing tool operator. Nor is there any objective evidence to support plaintiff’s subjective complaints of pain, although the medical evidence is that pain could be expected after plaintiff had been on his feet for a long period; given plaintiff’s injury and resulting osteomyelitis, his complaints are not unfounded. And it is also clear that, although the disease is in remission at this time, it could flare up at any time, even years in the future.
The sole basis of plaintiff’s claim for total and permanent disability benefits *782 is that he works in substantial pain. Under our jurisprudence he is not entitled to those benefits unless the pain is sufficiently substantial as to prevent him from carrying out some of the functions of his job, or so intense it hinders him in the performance of his duties.[3] Whether pain, particularly subjective pain, is substantial enough to be disabling is a question of fact to be decided by the trial court and the conclusion reached depends to a great extent on an evaluation of the plaintiff’s credibility and the other evidence presented.[4]
Here the trial judge specifically found the pain of which plaintiff complains was not sufficiently substantial as to prevent him from performing the same work he had been doing at the time he incurred the injury in suit. The record contains ample evidence which, if believed, supports that conclusion, especially the opinion of Dr. Gary, the treating orthopedic surgeon, and the fact that plaintiff complains of the pain occurring only after hours of standing when other testimony is to the effect that the job does not require such lengthy hours of standing. As it is clear the trial judge accepted both the opinion of Dr. Gary and the testimony showing the job does not require such lengthy hours of standing, we cannot say he committed error in reaching the conclusion now being discussed.
We reject plaintiff’s second and alternative contention, that he is entitled to permanent partial disability benefits, for the same reason we rejected the first. Since he has been found able to return to and perform the work he was doing at the time of his injury, there is no basis for an award of permanent partial disability.[5] We note the trial court finding, that plaintiff already has received compensation in excess of the amount to which he is entitled under the scheduled loss provisions of LSA-R.S. 23:1221(4)(h) and (o), is correct. As he had an 8% disability of the leg, $3,024 would be the maximum award under those provisions[6] and he has been paid $3,969.
For the reasons assigned, the judgment appealed from is affirmed.

AFFIRMED.

. An individual sent to various drilling platforms on land or offshore to retrieve, through the use of certain devices, tools or other objects which have become lodged in a drilling hole.

. (h) For the loss of a leg, sixty-six and two-thirds per centum of wages during one hundred seventy-five weeks.
(o) In all cases involving a permanent.partial loss of the use or function of the members mentioned hereinabove, compensation shall bear such proportion to the amounts named herein for the total loss of such members as the disability to such members bears to the total loss of the member, provided that in no case shall compensation for an injury to a member exceed the compensation payable for the loss of such member.

. Glidden v. Alexandria Concrete Company, 242 La. 625, 137 So.2d 894; Dupard v. M & C Construction Co., La.App., 312 So.2d 660.

. Holmes v. Morville Plantation, Inc., La.App., 314 So.2d 752.

. Lacour v. Highlands Insurance Company, La. App., 247 So.2d 611.

.$1,440 per mo. = $332.30 per wk. ($1,440 X 12 ■+■ 52); 65% of $332.30 = $216 per wk. X 175 weeks = $37,800 for loss of a leg; however, plaintiff has an 8% disability and 8% of $37,800 = $3,024.